IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL HICKEY,            ) | |
|     Plaintiff,        ) | |
| ) | |
| v.            ) | CIVIL ACTION NO. 1:22-00159-N |
| ) | |
| STATE FARM FIRE AND        ) | |
| CASUALTY COMPANY,          ) | |
|     Defendant.        ) | |

## MEMORANDUM OPINION AND ORDER

This action comes before the Court with the consent of the parties (Docs. 98, 99), and in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73 and S.D. Ala. GenLR 73, for resolution of cost disputes left outstanding after entry of partial summary judgment in favor of Defendant State Farm Fire & Casualty Co. ("State Farm") on May 30, 2023 (Doc. 83), and for entry of judgment under Fed. R. Civ. P. 54. Having reviewed the parties' briefs, evidentiary submissions and responses (Docs. 103, 104, 105, 106, 110, 111), and with the benefit of oral argument (Doc. 117), the undersigned concludes all cost disputes are to be resolved in State Farm's favor and that Plaintiff Michael Hickey ("Hickey") is entitled to no additional costs. Accordingly, and for the reasons stated herein, it is **ORDERED** that judgment be entered in State Farm's favor and that Hickey's action be **DISMISSED with prejudice**.

### I.    *Factual Background and Procedural History*

This action stems from an insurance dispute between Hickey and State Farm regarding the former's claims for damage to his residential property. The parties are familiar with the relevant facts, and they have previously been set out by the Court

1

in the May 30, 2023 Order ("May 30 Order") granting partial summary judgment to State Farm. (Doc. 83, PageID.2081-99). The Court incorporates those facts here.

State Farm moved for summary judgment under Rule 56(a) on all of Plaintiff's claims (Docs. 50, 51), and Senior United States District Judge Callie V.S. Granade granted State Farm summary judgment…

> … on all but Hickey's breach of contract claim regarding the items State Farm agrees are covered but that Hickey believes are undervalued – either because the cost of repair or to replace the item was underestimated or because an inappropriate depreciation amount was used to calculate the Actual Cost Value.

(Doc. 83, PageID.2127).[1] The May 30 Order disposed of all coverage issues, leaving only the cost disputes involving "the items State Farm agrees are covered but that Hickey believes are undervalued." (*Id.*). In closing, the May 30 Order noted "the remaining claim could now be decided by an appraiser," and directed the parties to meet-and-confer regarding whether "they wish to resolve the claim through the appraisal process or proceed with the claim in this Court." (*Id.*).

The parties met to discuss appraisal and the total amount left in controversy

---

[1] The May 30 Order also addressed State Farm's motion to limit or exclude the testimony of Plaintiff's causation expert, Charles Howarth, pursuant to Fed. R. Evid. 702 for noncompliance with applicable provisions of Fed. R. Civ. P. 26, which was granted in part and denied in part. (Doc. 83, PageID.2103-07, 2127). The Court found Howarth's causation testimony was due to be excluded; however, Howarth was "qualified to testify about the costs of repairing or replacing the damaged property… as an expert regarding the costs of damages, including ACV… common practices of appraisers or adjusters and his experience working with insurance companies… [and/or] as a lay or fact witness regarding his observations and actions during the events at issue in this case." (*Id.*).

With respect to Hickey's breach of contract claim for failure to pay the damages claimed, the Court determined that because Howarth's causation testimony was excluded, "Hickey has presented no evidence to support his claim that the items in Howarth's estimate that were not included in State Farm's estimate were caused by a covered loss..." (Doc. 83, PageID.2120). Thus, "State Farm is entitled to summary judgment on Hickey's claim that the items in Howarth's estimate that were not included in State Farm's estimate were caused by a covered loss. State Farm did not breach the policy by denying coverage for those items." (Doc. 83, PageID.2121).

shortly after entry of the May 30 Order, and it became apparent each side interpreted the order differently. (*See* Doc. 87). So, they filed a joint motion for clarification on June 13, 2023, wherein each side explained their respective positions as to what was left remaining at issue. (*Id.*). In response, the Court entered a clarification order dated June 14, 2023 ("June 14 Order"), stating in full:

> This matter is before the Court on the parties' joint motion for clarification. (Doc. 87). The parties disagree as to the meaning of this Court's Order of May 30, 2023 (Doc. 83), which granted summary judgment in part in favor of State Farm. Specifically, the parties dispute what remains of Hickey's breach of contract claim for failure to pay. Hickey apparently still wants to assert coverage under the policy for damage that State Farm did not agree is covered.
>
> In the summary judgment order this Court excluded the opinion testimony of Hickey's only expert, Charles Howarth, as to causation. After discussing the need for expert testimony to show causation, the Court concluded that Hickey had provided no admissible evidence to show coverage for the items in his estimate that State Farm contended were not covered. The Court found "that summary judgment is due to be granted in favor of State Farm on all but Hickey's breach of contract claim regarding the items State Farm agrees are covered but that Hickey believes are undervalued – either because the cost of repair or to replace the item was underestimated or because an inappropriate depreciation amount was used to calculate the Actual Cost Value." (Doc. 83 PageID.2127). The summary judgment Order completely disposed of the coverage dispute between the parties and left only the cost disputes as to items that State Farm had agreed are covered. The Order found that any item of damage not included in State Farm's estimate was not covered. The Order then concluded that "[s]ince the coverage issues have now been determined" by the Order "the remaining claim could now be decided by an appraiser." (Doc. 83, PageID.2127). Thus, the Court finds State Farm's assessment of the remaining claim is correct because Hickey cannot assert coverage for damage for which State Farm disputed coverage. To the extent this clarifies the Order of May 30, 2023, the parties' motion (Doc. 87), is **GRANTED**.

(Doc. 89). Subsequently, the parties consented to the undersigned Magistrate Judge's exercise of jurisdiction. (Docs. 98, 99). The parties came before the Court on August

11, 2023, for a status conference, where both sides agreed the outstanding cost disputes would be resolved on the briefs. (*See* Docs. 101, 102). Principal briefs were simultaneously filed (Docs. 103-06), each side was given an opportunity to respond (Docs. 110, 111) and all came before the Court for oral argument on October 31, 2023. (Doc. 117).

## II.   *Analysis*

In both briefing and oral argument, Hickey contends he is entitled to costs beyond the 277 line-items[2] included on State Farm's estimate[3] for one reason or another. (*See* Docs. 104, 117). However, both the May 30 Order and June 14 Order make clear that anything beyond the items contained in this estimate are no longer at issue because Hickey has no admissible evidence to support that any other items of damage claimed by him were caused by a covered loss. *See* n.1. (Doc. 83, PageID.2121). Specifically, the May 30 Order granted summary judgment "on all but Hickey's breach of contract claim regarding the ***items State Farm agrees are covered*** but that Hickey believes are undervalued," and the June 14 Order expressly states, "***any item of damage not included in State Farm's estimate*** was not covered." (Doc. 83, PageID.2127; Doc. 89). Try as he may, the Court views Hickey's argument as an attempt to relitigate issues already determined by the May 30 Order which are for current purposes established under the law of the case doctrine.

---

[2] The final numerical line-item included on this estimate is 301. (Doc. 103-2, PageID.2324). However, there are not 301 entries on the estimate when viewed in sequence, because there are no line-items (or numeric entries) for 249-65, 267, 272-74, 284, or 296-97. (*See* Doc. 103-2).

[3] State Farm's operative estimate for current purposes is the revised estimate dated February 23, 2021 (Doc. 103-2). (*See* Doc. 117). To avoid confusion moving forward, any references to State Farm's "estimate" is a reference to this revised estimate.

As a general matter, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). This rule, and the law of the case doctrine writ large, "promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Id*. (citation omitted). No doubt this doctrine is a flexible one, as a district court is always free to reconsider previous rulings entered in the context of a live case before it. *Id*. at 817 (citation omitted) (explaining the doctrine is not a limit on the Court's power, but an expression of "the practice of courts generally to refuse to reopen what has been decided."). *See* 18 Moore's Federal Practice - Civil § 134.22, 1(c) (2023) ("After some issues in a litigation have been decided, the case may be transferred to another judge in the same court. The law of the case doctrine applies to the decision of a coordinate court in the same way as it applies to a court's own decisions… [a] judge may review the decision made earlier by another judge in the same way as a judge may review his or her own decision.").Yet, while "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, (*sic*.) as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson*, 486 U.S. at 817 (citations omitted).

Where, as here, a motion for summary judgment or partial summary judgment has been entered in a case, that ruling "is the law of the case on the issues decided" moving forward, unless there is some basis for reconsideration. *United States v.*

5

*Horton*, 622 F.2d 144, 148 (5th Cir. 1980).[4] Hickey has not moved for reconsideration of the May 30 Order, argued that it was clearly erroneous or made the point that it would result in manifest injustice. While he has not hidden that he plans to appeal it (*see e.g.*, Doc. 94), disagreement with a ruling's outcome is not grounds enough for the Court to take up reconsideration *sua sponte*, especially considering the above-noted law of the case principles applicable here. Even if the Court were inclined to do so, the undersigned sees no plain error in the well-reasoned conclusions reached by the May 30 Order, or the subsequent directives in both that order and the June 14 Order with regard to what remains unsettled in this action.

As such, the analysis moving forward is limited to the proper valuation of the items contained on State Farm's estimate, and nothing beyond the 277 line-items listed on that estimate are before the Court at this time. With respect to these 277 line-items, the Court's inquiry is two-fold: (1) whether the cost of repair or replacement was underestimated by State Farm or (2) whether State Farm used an inappropriate depreciation percentage to calculate actual cash value.

Before addressing these inquiries, the Court addresses the methodology for calculating replacement cost value ("RCV") and actual cost value ("ACV") under the policy. The May 30 Order explains:

> While the parties agree that the policy at issue is a replacement value policy, the policy provides that "only the actual cash value of the damage property" will be paid "until repair or replacement is completed." (Doc.

---

[4] Although *Horton*'s reliance on the law of the case doctrine was later questioned in *United States v. Williams*, 728 F.2d 1402, 1406 (11th Cir. 1984), the Supreme Court's decision in *Christianson*, put to rest any concerns the *Williams* Court may have raised with respect to the doctrine's applicability among coordinate courts and within the context of the same court's own decisions. 486 U.S. at 816. *See* 18 Moore's Federal Practice Civil § 134.22 (2023).

6

> 51-2, PageID.914). The Court notes that "if property is not repaired or replaced within two years after the date of the loss" the policy states that State Farm "will pay only the actual cash value." (Doc. 51-[2], PageID.914).

(Doc. 83, PageID.2122). Here, the date of the loss was September 16, 2020. (Doc. 103-2, PageID.2288). So, for any of the 277 line-items not repaired or replaced by September 16, 2022, Hickey is only entitled to ACV. The record indicates repairs and replacement have largely not been completed to date, and therefore not completed within the two-year window under the policy. (*See* Doc. 73, PageID.1463 (stating in response to State Farm's summary judgment motion that, "the residence, still uninhabitable, has not been repaired.")). (*See also*, Doc. 117). The only exception appears to be some parts of the roof.[5]

Under the policy, the ACV of the items at issue can only be determined after RCV is determined because it is a replacement value policy. (*See* Docs. 51-2, 83). ACV is "the value of the damaged part of the property at the time of the loss, calculated as the estimated cost to repair or replace such property, less a deduction to account for pre-loss depreciation." (Doc. 51-2, PageID.896).[6] The "value of the damaged part of the property at the time of the loss" is the RCV – i.e., "the estimated cost to repair or replace such property." (*Id*.). (*See* Doc. 103-2, PageID.2285) ("Replacement Cost Value

---

[5] The record indicates at least some repairs to the roof were made or begun within the two-year repair and replacement period. (Doc. 73, PageID.1463 (noting "part of the roof has been replaced"); Doc. 73, PageID.1468 (explaining Hickey "tarped the roof to prevent further damage…"); Doc. 65, PageID.1330 (noting State Farm's expert Joel Wehrman inspected the home "twenty-five months later… and the complete roof had been replaced…")). If such repairs were in fact completed by September 16, 2022, it is possible Hickey could be entitled to RCV on those items under the policy. However, Hickey does not state what, if any, repairs were completed within the two-year window, does not argue that he should be entitled to RCV for roof-specific items, nor even identify what those items would be.

[6] "ACV = Actual Cash Value, or RCV at the time of loss minus depreciation." (Doc. 51-2, PageID.884).

(RCV) – Estimated cost to repair or replace damaged property")).[7] Once RCV is determined, it is used to calculate ACV, which is "[t]he repair or replacement cost of the damaged part of the property less depreciation and deductible" or "RCV at the time of the loss minus depreciation." (Doc. 51-2, PageID.884; Doc. 103-2, PageID.2285). The policy itself specifies:

> For this calculation, all components of this estimated cost including, but not limited to:
>
>     a. materials, including any tax;
>     b. labor, including any tax; and
>     c. overhead and profit;
>
> are subject to depreciation.
>
> The depreciation deduction may include such considerations as:
>
>     a. age;
>     b. condition;
>     c. reduction in useful life;
>     d. obsolescence; and
>     e. any pre-loss damage including wear, tear, or deterioration;
>
> of the damaged party of the property.

(Doc. 51-2, PageID.896).

Having set out the methodology for reaching ACV, the undersigned turns again to State Farm's estimate. (Doc. 103-2, PageID.2284-2330). For the 277 line-items at issue, State Farm calculated a total RCV of $81,885.65. (Doc. 103-2, PageID.2330). This total, however, includes 25 line-items associated with ServPro's water extraction and remediation services, totaling $3,681.96, which State Farm paid directly to

---

[7] "RCV = Replacement Cost Value, or the cost to repair or replace your home, other structures or contents with like kind and quality." (Doc. 51-2, PageID.884).

ServPro on February 24, 2021. (Doc. 51-1, PageID.778; Doc. 83, PageID.2090). Because payment for these 25 line-items has already been made, the starting point for current purposes is an RCV of $78,203.69 among 252 line-items. (Doc. 103-2, PageID.2286). Using this figure, State Farm subtracted depreciation, including taxes ($30,263.50), General Contractor Overhead & Profit ($6,053.16) and a deductible ($17,135.00) to reach an ACV of $24,752.03 (Doc. 103-2, PageID.2286). State Farm has already paid Hickey this ACV amount in two installments of $22,885.44 (on October 23, 2020) and $1,866.59 (on February 23, 2021), respectively. (Doc. 51-1, PageID.778).

### A. The Cost of Repair and Replacement was Not Underestimated

Hickey raises three sub-points in arguing that State Farm underestimated the cost of repair and/or replacement: (1) State Farm did not use the appropriate price list, (2) State Farm did not reevaluate the price list "based on the contractor's estimate as well as the reason for any delay in beginning the work," (Doc. 111, PageID.2769 (citing Doc. 103-2, PageID.2278)), and (3) State Farm did not use like kind and quality materials in compiling its estimate. Each point is unpersuasive and addressed in turn.

    1. <u>State Farm used the appropriate price list</u>

State Farm used a price list from September 2020 ("ALMB28_SEP20"), while Howarth used a price list from April 2021 ("ALMB8X_APR21"). (Doc. 103-2, PageID.2286; Doc. 105-1, PageID.2425). Under the policy, the "estimated cost to repair or replace such property," or RCV, is reached by looking to "the damaged part

9

of the property *at the time of the loss.*" (Doc. 51-2, PageID.884, 896). State Farm used a price list from September 2020, and the loss occurred in this same month. (Doc. 103-2, PageID.2288, 2333). Therefore, the undersigned finds that State Farm has utilized the correct price list.

    2. <u>State Farm was not obligated to reevaluate the price list</u>

Hickey further attacks State Farm's use of the September 2020 price list by pointing to the declaration of State Farm's expert B.J. Sumner – particularly, his statement that "[o]nce Mr. Hickey began work, the price list can be reevaluated based on his contractor's estimate as well as the reason for any delay in beginning work." (Doc. 111, PageID.2769-70 (citing Doc. 103-2, PageID.2278)). State Farm's other expert, Eric Thibault, similarly stated in his declaration: "Once repairs were started, the price list could be reevaluated based on his contractor's estimate as well as the reason for any delay in beginning work." (Doc. 103-4, PageID.2433). Hickey opines that State Farm "has not done what its own expert recommended" by failing to reevaluate the price list. This argument is unpersuasive for several reasons.

First, Hickey's criticism on State Farm's failure to do so is not based on a failure to comply with the policy itself, as there is no express provision therein relating to reevaluation of a price list based on a contractor's estimate and any reason(s) for delay. (*See* Doc. 51-2). Instead, it stems from "guidance" set out in State Farm's Operations Guide. (*See* Doc. 73, PageID.1466; Doc. 73-5, PageID.1580; Doc. 66-5, PageID.1437-39). The Operations Guide explains on this point:

> Claim handlers have flexibility to permit exceptions that would allow a full replacement cost payment before restoration is complete. These

> exceptions generally present themselves in cases where repairs are substantially underway, or a contract for repairs has been entered into between the insured and repair firm that is acceptable to us. Completion of debris removal, demotion and/or tear out of damaged property is not considered substantial repairs. We encourage the claim handler to exercise sound judgment on each claim.

(Doc. 66-5, PageID.1439). Thus, the statements made by Sumner and Thibault represent the exception, not the rule. Second, the record does not show repairs were "substantially underway" at any point in such a manner that could trigger the claim handler's flexibility to invoke this exception.[8] Third, both declarations indicate the reevaluation "could" or "can" occur after repairs began, not that State Farm was required to do so. (Docs. 103-2, 103-4). And fourth, assuming *arguendo* that State Farm should have used a different price list for certain items due to substantially underway repairs, Hickey does not offer an alternative beyond his carte blanche assertion that Howarth's use of the April 2021 price list was appropriate. In sum, State Farm was not obligated to reevaluate the price list and has not underestimated the cost of repair or replacement by opting not to.

3. <u>The kind and quality of replacements was appropriate</u>

Hickey argues some of the items on State Farm's estimate – specifically those relating to the plaster walls and insulation – are not of "like kind and quality" and that State Farm has "substituted cheaper items than what is actually there." (Docs.

---

[8] Based on the record's indications that repairs to the roof were completed 25 months after the loss, *see* n.5, it is possible these damages could have been reevaluated within the exception to the Operations Guide's guidance; however, Hickey does not argue State Farm should have done so – nor does he argue such a position was ever articulated to State Farm during correspondence relating to the underlying claim. Moreover, roof-specific repairs are not raised in Hickey's brief or opposition response to State Farm's brief. (Docs. 104, 111).

11

104, 111). There is no dispute that the policy calls for like kind and quality replacements in calculating RCV (Doc. 51-2), and Sumner agreed Hickey is entitled to like kind and quality replacements. (Doc. 103-2). Sumner specifically agreed that Hickey is entitled to plaster walls if he wants them. (Doc. 73-5, PageID.1581; Doc. 83, PageID.2095)). Hickey's current contention that State Farm used cheaper items stems from the following exchange during Howarth's deposition:

> **Howarth**: Now, in this instance, the State Farm adjuster is not using the same materials or similar materials to what is in the home. He is substituting cheaper items in the State Farm estimate than what's actually there.
>
> **SF Counsel**: Can you give me some examples of the cheaper items?
>
> **Howarth**: Yes, sir. One is he is utilizing for plaster an entry for gypsum lath and two-coat plaster.
>
> **SF Counsel**: As opposed to the three-coat plaster that you're recommending?
>
> **Howarth**: Yes, sir. This is a wood lath with three-coat plaster. And in a historical application, we would – our estimate would have gone back with wood lath and three-coat plaster.
>
> **SF Counsel**: Would –
>
> **Howarth**: Hang on. Hang on. The last time I priced that, close to $20 a square foot. In this case, we utilized the closest thing to it. And that the Xactimate entry for wire lath and three-coat plaster. And that would be the most appropriate entry. State Farm used cheaper product there. The used a cheaper product for insulation. There were other places where they used cheaper products.
>
> **SF Counsel**: Was the original construction of this house three-layer plaster?
>
> **Howarth**: Yes. The original construction is wood lath. And wood lath and plaster is a three-coat plaster process. A brown coat, scratch coat, and a finish coat. Parts of this house had drywall. And, of course, that's

easy. Half inch or three-quarter inch of drywall. The ceiling in the upstairs kitchen was a particleboard backer with three-coat plaster on it. It was not a gypsum board. That would be closer. But it's still a three-coat application. And putting three coats of any wet cementitious substance, material on a wall takes a lot longer than just two coats. Because there's drying times, you have to wait overnight. You come back. And so that's why it's much cheaper to go with a gypsum and two coat than wire and three coat. And that was inappropriate. And, look, everybody makes mistakes. But they've got plenty of time to fix it. They've seen the facts now and they've just dug in their heels and refused to do what's right. That's where the misconduct exists.

(Doc. 73-13, PageID.1699-1701).

As an initial observation, State Farm's estimate includes several line-items relating to plaster walls – for example, entries 23-25, 54-56, 75-76, 155-56, 170-171, 196-197 and 220-221. As such, it would appear that Sumner's statement affirming Hickey's entitlement to plaster walls is not contradictory of what is already in State Farm's estimate. The exchange between Howarth and State Farm's counsel indicates the dispute over "like kind and quality" has to do with the materials used to repair and replace the plaster walls,[9] with Howarth essentially contending that State Farm's use of gypsum boards and two-coat plaster is not a "like kind and quality" replacement for the original wood lath with three-coat plaster. (*See* Doc. 73-13). Hickey again points to the State Farm Operations Guide for support here, specifically to its definition of "similar construction" as meaning "having characteristics in common or strictly comparable." (Doc. 104, PageID.2461 (citing Doc. 73-16, PageID.1734)).

---

[9] No additional discussion is included in Hickey's recent filings regarding insulation. (Docs. 104, 111)

13

It should again be noted that this Operations Guide is not the policy and is not binding, it is only "guidance." (Doc. 73-16, PageID.1734). Moreover, because the original plaster walls were wood lath with three-coat plaster, it follows that a "strictly comparable" replacement would be wood lath with three-coat plaster. (*See* Doc. 73-13). State Farm does not use wood lath with three-coat plaster in its estimate. (Doc. 103-2). But neither does Howarth; he used "wire lath and three-coat plaster," which he asserts is the "closest thing" to wood lath and three-coat plaster for on his Xactimate estimate. (Doc. 73-13; Doc. 105-1). However, his Xactimate estimate was based on an improper price list. *See* II(A)(i), *supra*. And Hickey has not offered anything further beyond Howarth's opining based on this improper price list to show that State Farm's use of gypsum lath and two-coat was an inappropriate like kind and quality replacement. At a minimum, it appears State Farm's use of gypsum and two-coat plaster has "characteristics in common" with the original wood lath and three-coat plaster in the home. As such, the undersigned concludes State Farm's use of these replacement materials was appropriate here.

### B. State Farm Used Appropriate Depreciation Rates

The second main point of contention in this cost dispute deals with the proper depreciation rate to be applied to the items on State Farm's estimate. As noted above, the depreciation rate is used in the RCV calculation to reach ACV, and the Court finds the rate(s) applied by State Farm here were appropriate.

As an initial point, Howarth's estimate does not include depreciation. (Doc. 105-1). He explained during his deposition that the goal of his estimate was to

14

determine RCV, and that depreciation rate(s) were typically applied "at the end of the process." (Doc. 103-6, PageID.2449-50). He opined that an 8% depreciation rate "to the bottom line" in this case would be appropriate because in his experience "they all run around eight percent." (*Id.*). Yet, he also makes clear that certain items are depreciated at different rates than others, which runs contrary to his eight-percent-across-the-board approach. (*Id.*).

State Farm, on the other hand, applied varying depreciation rates to each of the individual line-items based upon the factors articulated in the policy for reaching ACV. (Doc. 103, PageID.2215-20). (*See* Doc. 103-2).[10] Thibault stated that he applied varying rates for each of the items because "different aspects of the property have different ages and conditions." (Doc. 103-4). His conclusions, which align with the relevant provision of the policy, were reached after conducting an inspection of the home with Hickey's participation. (*Id.*). The undersigned does not see any error with the methodology applied by Thibault, nor has Hickey pointed to an alternative approach beyond the 8% depreciation rate "to the bottom line" opined by Howarth in his deposition. As such, the Court is satisfied that State Farm has utilized an appropriate deprecation rate.

### C. State Farm Owes Nothing Further to Hickey

As previously noted, after removing the $3,681.96 payment made directly to ServPro, State Farm calculated a RCV of $78,203.69 among 252 line-items included

---

[10] Hickey's contention that "State Farm took a whopping 40% depreciation on its estimate" is disingenuous. (Doc. 104, PageID.2457). While State Farm's estimate may have resulted in an approximate 40% depreciation rate to the bottom line, its estimate applies varying depreciation rates to each individual line-item. (*See* Doc. 103-2).

on its estimate. (Doc. 103-2). It used the appropriate price list from September 2020 in doing so. *See* II(A)(i), *supra*. Then, State Farm appropriately depreciated each of the 252 line-items at varying rates based upon the factors set out in the policy, including taxes, by $30,263.50, *see* II(B), *supra.*, removed costs for General Contractor Overhead & Profit ($6,053.16) and applied a deductible ($17,135.00) to reach an ACV of $24,752.03. (Doc. 103-2, PageID.2286). Because State Farm has already paid Hickey this ACV amount in two installments of $22,885.44 and $1,866.59, (Doc. 51-1, PageID.778), he is owed nothing further from State Farm for Hickey's breach of contract claim for failure to pay.

### III.   *Conclusion*

For the reasons stated herein, the outstanding cost disputes remaining after the May 30 entry of partial summary judgment in favor of State Farm and against Hickey are resolved in State Farm's favor, and nothing further is owed to Hickey under the policy. Accordingly, it is **ORDERED** that judgment be entered in favor of State Farm and that Plaintiff's action be **DISMISSED with prejudice**. Final judgment shall enter separately in accordance with Fed. R. Civ. P. 58.

**DONE** and **ORDERED** this the 6th day of February 2023.

> */s/ Katherine P. Nelson*
> **KATHERINE P. NELSON**
> **UNITED STATES MAGISTRATE JUDGE**